IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

RAYMOND SUAREZ,            )
    *pro se* Plaintiff,       )
                      )
        v.            )     Civil No. 3:18cv128 (REP)
                      )
NANCY A. BERRYHILL,      )
Acting Commissioner of Social Security,  )
    Defendant.           )
_____)

## REPORT AND RECOMMENDATION

On March 12, 2013, Plaintiff Raymond Suarez ("Plaintiff") protectively applied for

Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"), alleging

disability from anxiety, depression, arthritis, vasovagal syncope, fibromyalgia, enlarged prostate

due to chronic prostatitis, autonomic dysfunction and panic attacks, with an alleged onset date of

May 28, 2010. The Social Security Administration ("SSA") denied Plaintiff's claim both

initially and upon reconsideration. Thereafter, an Administrative Law Judge ("ALJ") denied

Plaintiff's claim in a written decision. Plaintiff requested review by the Appeals Council, who

ordered remand of Plaintiff's claim. Upon further consideration, the ALJ again denied Plaintiff's

claim and the Appeals Council denied Plaintiff's request for review, rendering the ALJ's second

decision as the final decision of the Commissioner ("Defendant").

Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g),

arguing that the ALJ erred by: (1) ignoring substantial evidence that Plaintiff qualified as

disabled under Listings 12.04 and 12.06; (2) finding that Plaintiff's statements concerning the

intensity, persistence and limiting effects of his symptoms did not comport with the evidence of

record; (3) improperly applying the treating physicians rule to the opinions of Plaintiff's treating physicians and psychiatrists, Prakash Ettigi, M.D., Banerje Koduru, M.D., and Charles Brehmer, M.D.; (4) affording great weight to the opinion of Jeffrey Freemont, Ph.D., the medical expert ("ME") who testified during Plaintiff's August 17, 2017 hearing;  (5) relying on the wrong hypothetical to reach her step-five determination that Plaintiff did not qualify as disabled; and, (6) failing to recuse herself as the ALJ.  (Pl.'s Mot. Summ. J. & Br. in Supp. ("Pl.'s Mem.") (ECF No. 10) at 2-3.)  This matter now comes before the Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on the parties' cross-motions for summary judgment, rendering the matter ripe for review.[1]  For the reasons that follow, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 10) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 11) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

## I.      PROCEDURAL HISTORY

On March 12, 2013, Plaintiff protectively applied for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"), alleging disability from anxiety, depression, arthritis, vasovagal syncope,[2] fibromyalgia,[3] enlarged prostate due to chronic

---

[1]      The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C).  In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments, and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

[2]      Patients with vasovagal syncope experience pallor, nausea, sweating, bradycardia and rapid drops in their arterial blood pressure, causing lost consciousness.  Emotional stress often evokes these symptoms.  *Syncope*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).

[3]      Fibromyalgia denotes pain or stiffness in the muscles and joints, often diffused throughout the body.  *Fibromyalgia*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).

2

prostatitis,[4] autonomic dysfunction[5] and panic attacks, with an alleged onset date of May 28, 2010.  (R. at 454, 489.)  The SSA denied Plaintiff's claim on August 21, 2013, and again upon reconsideration on December 27, 2013.  (R. at 206-10, 212-14.)  At Plaintiff's written request, the ALJ held a hearing on May 18, 2015.  (R. at 103-30.)  On June 4, 2015, the ALJ issued a written opinion, denying Plaintiff's claim and concluding that Plaintiff did not qualify as disabled under the Act.  (R. at 203.)  On December 5, 2016, the Appeals Council granted Plaintiff's request for review, explaining that the ALJ failed to provide an adequate evaluation of the opinion of James Sanderlin, M.D., a non-treating source.  (R. at 203-04.)  On remand, the Appeals Council instructed the ALJ to "give further consideration to [Plaintiff's] maximum residual functional capacity" and to "obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on [Plaintiff's] occupational base."  (R. at 203-04.)

Following remand, the ALJ held two more hearings:  one on March 21, 2017, during which Plaintiff (then represented by counsel) testified; and, another on August 17, 2017, during which Plaintiff (again represented by counsel), a vocational expert ("VE") and a medical examiner ("ME") testified.  (R. at 71-102, 131-65.)  On November 14, 2017, the ALJ issued a written opinion, again denying Plaintiff's claim and concluding that Plaintiff did not qualify as disabled under the Act, because Plaintiff could perform jobs existing in significant numbers in the national economy during the relevant period.  (R. at 24-25.)  On January 27, 2018, the

---

[4]    Prostatitis describes inflammation of the prostate brought on by a range of causes, including allergic reactions and bacterial infections.  *Prostatitis*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).

[5]    Patients with autonomic dysfunction, or dysautonomia, experience malfunctioning of their autonomic nervous system, which controls internal temperatures, breathing, blood pressure, heart rate, pupil dilation, sexual arousal and excretion.  *Dysautonomia*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).

3

Appeals Council denied Plaintiff's request for review, rendering the ALJ's second decision as

the final decision of the Commissioner subject to review by this Court.  (R. at 1-7.)

## II.   STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court "will affirm the

Social Security Administration's disability determination 'when an ALJ has applied correct legal

standards and the ALJ's factual findings are supported by substantial evidence.'"  *Mascio v.*

*Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d

337, 340 (4th Cir. 2012)).  Substantial evidence requires more than a scintilla but less than a

preponderance and includes the kind of relevant evidence that a reasonable mind could accept as

adequate to support a conclusion.  *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig*

*v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).  Indeed, "the substantial evidence standard

'presupposes . . . a zone of choice within which the decision makers can go either way, without

interference by the courts.  An administrative decision is not subject to reversal merely because

substantial evidence would have supported an opposite decision.'"  *Dunn v. Colvin*, 607 F.

App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir.

1988)).  To determine whether substantial evidence exists, the court must examine the record as

a whole, but may not "undertake to re-weigh conflicting evidence, make credibility

determinations, or substitute [its] judgment for that of the [ALJ]."  *Hancock*, 667 F.3d at 472

(quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)).  In considering the decision of

the Commissioner based on the record, the court must "take into account whatever in the record

fairly detracts from its weight."  *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974)

(quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).  The Commissioner's

findings as to any fact, if substantial evidence in the record supports the findings, bind the

4

reviewing court to affirm regardless of whether the court disagrees with such findings. *Hancock*, 667 F.3d at 477. If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

The Social Security Administration regulations set forth a five-step process that the agency employs to determine whether disability exists. 20 C.F.R. § 404.1520(a)(4); *see Mascio*, 780 F.3d at 634-35 (describing the ALJ's five-step sequential evaluation). To summarize, at step one, the ALJ looks at the claimant's current work activity. § 404.1520(a)(4)(i). At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements. § 404.1520(a)(4)(ii). Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations. § 404.1520(a)(4)(iii). Between steps three and four, the ALJ must assess the claimant's residual functional capacity ("RFC"), accounting for the most that the claimant can do despite her physical and mental limitations. § 404.1545(a). At step four, the ALJ assesses whether the claimant can perform her past work given her RFC. § 404.1520(a)(4)(iv). Finally, at step five, the ALJ determines whether the claimant can perform any work existing in the national economy. § 404.1520(a)(4)(v).

### III. THE ALJ'S DECISION

Following remand by the Appeals Council, on March 21, 2017, the ALJ held a hearing during which Plaintiff (then-represented by counsel) testified. (R. at 71-102.) During the March 21 hearing, the ALJ and Plaintiff's attorney representative discussed the sparsity of Plaintiff's record. (R. at 98.) To better guide her decision, the ALJ decided to send Plaintiff's records to a ME for an opinion on the severity of Plaintiff's psychological condition, which the ME would

offer at a subsequent hearing.  (R. at 100-01.)  On August 17, 2017, the ALJ convened a second

hearing, during which Plaintiff (again represented by counsel), the ME and a VE testified.  (R. at

131-65.)  On November 14, 2017, the ALJ issued a written opinion, finding that Plaintiff did not

qualify as disabled under the Act.  (R. at 11-26.)

  The ALJ followed the five-step evaluation process established by the Social Security Act

in analyzing Plaintiff's disability claim.  (R. at 14-25.)  At step one, the ALJ found that Plaintiff

had not engaged in substantial gainful activity between his alleged onset date of May 28, 2010,

and his date last insured of September 30, 2016.  (R. at 14.)  At step two, the ALJ held that

Plaintiff had the following severe impairments:  post-traumatic degenerative joint disease in the

right thumb, depression and anxiety disorder.  (R. at 14-15.)  At step three, the ALJ concluded

that Plaintiff did not suffer from an impairment or combination of impairments that met or

medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

(R. at 15.)

  In assessing Plaintiff's RFC, the ALJ found that, through the date last insured, Plaintiff

could perform light work with additional limitations.  (R. at 16.)  Specifically, Plaintiff could

only occasionally climb ramps and stairs and never climb ladders, ropes and scaffolds.  (R. at

16.)  Plaintiff could occasionally balance, stoop and crouch, but could never kneel or crawl.  (R.

at 16.)  Plaintiff could frequently, though not constantly or repetitively, grasp, handle and finger

with his right, dominant hand.  (R. at 16.)  And Plaintiff could not handle exposure to any

workplace hazards.  (R. at 16.)  The ALJ concluded that Plaintiff could perform unskilled work

with a specific vocational preparation ("SVP") of no more than two in a non-production-oriented

work setting, with no public interaction and only occasional interaction with co-workers and

supervisors.  (R. at 16.)

At step four, the ALJ determined that Plaintiff could not perform any past relevant work. (R. at 24.)  However, at step five, the ALJ found that Plaintiff could perform jobs existing in significant numbers in the national economy, including work as a classifier (e.g., laundry sorter), router and cafeteria attendant.  (R. at 24-25.)  Accordingly, the ALJ concluded that, during the relevant period, Plaintiff did not qualify as disabled under the Act.  (R. at 25.)

IV.    ANALYSIS

Plaintiff, thirty-nine years old at the time of this Report and Recommendation, previously worked as a mechanic.  (R. at 486, 491.)  He applied for DIB, alleging disability from anxiety, depression, arthritis, vasovagal syncope, fibromyalgia, enlarged prostate due to chronic prostatitis, autonomic dysfunction and panic attacks, with an alleged onset date of May 28, 2010. (R. at 486, 489.)  Plaintiff appeals to this Court, contending that the ALJ erred by:  (1) ignoring substantial evidence that Plaintiff qualified as disabled under Listings 12.04 and 12.06; (2) finding that Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms did not comport with the evidence of record; (3) improperly applying the treating physician rule to the opinions of Plaintiff's treating physicians and psychiatrists, Dr. Ettigi, Dr. Koduru, and Dr. Brehmer; (4) affording great weight to the opinion of Dr. Freemont, the ME who testified during Plaintiff's August 17, 2017 hearing;  (5) relying on an incomplete hypothetical to reach her step-five determination that Plaintiff did not qualify as disabled; and, (6) failing to recuse herself as the ALJ.  (Pl.'s Mem. at 2-3.)  For the reasons set forth below, the ALJ did not err in her decision.

7

**A.    Substantial Evidence Supports the ALJ's Finding that Plaintiff's Mental Impairments Did Not Meet or Medically Equal the Criteria of Listings 12.04 and 12.06.**

Plaintiff first challenges the ALJ's step-three determination that Plaintiff's mental impairments did not meet or medically equal the severity of the listed impairments in Listings 12.04 (depressive, bipolar and related disorders) and 12.06 (anxiety and obsessive-compulsive disorders). (Pl.'s Mem. at 2.)  Specifically, Plaintiff contends that substantial evidence supports a finding that he qualified as disabled under those listings. (Pl.'s Mem. at 2.)  Defendant responds that substantial evidence supports the ALJ's step-three conclusions and that it is not the role of this Court to reweigh the evidence on judicial review.  (Def.'s Mot. Summ. J. & Br. in Supp. Thereof ("Def.'s Mem.") (ECF No. 11) at 18-22.)  Because "[a]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision," *Clarke*, 843 F.2d at 272-73, the Court agrees with Defendant that it cannot and should not reweigh the evidence.  Instead, the Court will consider only whether substantial evidence supports the ALJ's step-three conclusions.

At step three, Plaintiff bears the burden of proving that he meets or medically equals a listing. *Yuckert*, 482 U.S. at 146 n.5.  The listings "were designed to operate as a presumption of disability that makes further inquiry unnecessary" and, consequently, require an exacting standard of proof. *Sullivan v. Zebley*, 493 U.S. 521, 532-33 (1990.)  "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Zebley*, 493 U.S. at 530.

Plaintiff's condition must satisfy all of the enumerated criteria in Listings 12.04 or 12.06 to qualify him as disabled at step three. *Id.* at 530. Specifically, to meet the requirements of Listing 12.04, Plaintiff must first provide medical documentation of either:

> 1. Depressive disorder, characterized by five or more of the following: a. Depressed mood; b. Diminished interest in almost all activities; c. Appetite disturbance with change in weight; d. Sleep disturbance; e. Observable psychomotor agitation or retardation; f. Decreased energy; g. Feelings of guilt or worthlessness; h. Difficulty concentrating or thinking; or, i. Thoughts of death or suicide. [OR]
>
> 2. Bipolar disorder, characterized by three or more of the following: a. Pressured speech; b. Flight of ideas; c. Inflated self-esteem; d. Decreased need for sleep; e. Distractibility; f. Involvement in activities that have a high probability of painful consequences that are not recognized; or, g. Increase in goal-directed activity or psychomotor agitation.

20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.04. For Listing 12.06, Plaintiff must provide medical documentation of either:

> 1. Anxiety disorder, characterized by three or more of the following: a. Restlessness; b. Easily fatigued; c. Difficulty concentrating; d. Irritability; e. Muscle tension; or, f. Sleep disturbance. [OR]
>
> 2. Panic disorder or agoraphobia, characterized by one or both: a. Panic attacks followed by persistent concern or worry about additional panic attacks or their consequences; or, b. Disproportionate fear or anxiety about at least two different situations (for example, using public transportation, being in a crowd, being in a line, being outside of your home, being in open spaces). [OR]
>
> 3. Obsessive-compulsive disorder, characterized by one or both: a. Involuntary, time-consuming preoccupation with intrusive, unwanted thoughts; or, b. Repetitive behaviors aimed at reducing anxiety.

*Id.* at 12.06.

Upon presenting sufficient medical documentation of any of the disorders in either Listing 12.04 or 12.06, Plaintiff must then present documentation showing either:

B.  Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 12.00F):[6]  1. Understand, remember, or apply information (see 12:00E1).  2. Interact with others (see 12.00E2).  3. Concentrate, persist, or maintain pace (see 12.00E3).  4. Adapt or manage oneself (see 12.00E4).  [OR]

C.  [That Plaintiff's] mental disorder in this listing category is "serious and persistent;" that is, [Plaintiff has] a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:  1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of [Plaintiff's] mental disorder (see 12.00G2b); and, 2. Marginal adjustment, that is, [Plaintiff has] minimal capacity to adapt to changes in [his] environment or to demands that are not already part of [his] daily life (see 12.00G2c).

*Id.* at 12.04, 12.06.

Here, the ALJ determined that Plaintiff's mental impairments, both singly and in combination, failed to meet or medically equal the criteria of Listings 12.04 and 12.06.  (R. at 15.)  The ALJ first considered whether Plaintiff's impairments satisfied the requirements of Paragraph B in the respective listings, which require proof of either an extreme limitation in one, or marked limitations in two, enumerated areas of mental functioning.  (R. at 15); 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.04B, 12.06B.  The ALJ found that Plaintiff had only moderate limitation in his ability to understand, remember or apply information, noting that Plaintiff's records revealed decreased memory on some occasions but generally recorded normal functioning.  (R. at 15.)  The ALJ further noted evidence showing that Plaintiff had "fair to good judgment and superficial to fair insight."  (R. at 15.)  And the ALJ discredited Plaintiff's Montreal Cognitive Assessment ("MOCA") score from his consultative psychological

---

[6]      The regulations define "extreme limitation" to mean "[the claimant is] not able to function in this area independently, appropriately, effectively, and on a sustained basis." "Marked limitation," on the other hand, means that "[the claimant's] functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited." 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00F2.

examination, which indicated cognitive difficulties, explaining that the consultative examiner found the score invalid. (R. at 15, 875.)

The ALJ also found only moderate limitation in Plaintiff's ability to interact with others. (R. at 15.) The ALJ noted Plaintiff's statements about his limited social life, but observed that Plaintiff repeatedly appeared "cooperative, pleasant, and polite" during appointments and exhibited mostly "good" eye contact. (R. at 15.)

As to Plaintiff's ability to maintain concentration, persistence and pace, the ALJ likewise found only moderate limitation. (R. at 15.) The ALJ explained that the medical evidence of record revealed "varying levels of concentration and attention from good to poor." (R. at 15.) The ALJ heavily weighed Plaintiff's ability to correctly calculate five of five Serial Sevens[7] during one of his consultative psychological examinations, with the examiner further recording that Plaintiff's cognitive functioning appeared "broadly within normal limits." (R. at 15-16, 875.)

As to Plaintiff's ability to adapt and manage himself, the ALJ again found only moderate limitation. (R. at 16.) The ALJ noted that Plaintiff testified to bathing himself and changing his own clothes once or twice a week. (R. at 16.) The ALJ also considered Plaintiff's testimony that he performed very little house and yard work. (R. at 16.) However, the ALJ explained that Plaintiff's records noted "varying hygiene and grooming from poor and disheveled to good," warranting the ALJ's moderate limitation finding. (R. at 16.)

Because Plaintiff failed to establish that he suffered at least one extreme limitation or two marked limitations in the required areas of functioning, the ALJ concluded that Plaintiff did not

---

[7]     This test assesses mental functioning and requires the subject to count down from one hundred in increments of seven.  Robert Thomas Manning, *The Serial Sevens Test*, 142 <u>Archives of Internal Medicine</u> 1192 (1982).

satisfy Paragraph B of Listings 12.04 and 12.06.  (R. at 16.)  The ALJ then found that Plaintiff

further failed to establish that he met the Paragraph C criteria under each listing, which required

evidence of the persistence and seriousness of Plaintiff's impairments, including Plaintiff's

minimal capacity to adapt to environmental changes and demands not already part of Plaintiff's

daily life.  (R. at 16); 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.04C, 12.06C.  The ALJ explained

that the record failed to show that Plaintiff could make only marginal adjustments, which

precluded Plaintiff from satisfying the Paragraph C criteria.  (R. at 16.)  And the ALJ added that

the opinions of the state agency psychological consultants agreed with her conclusions.  (R. at

16.)  With neither Paragraph B nor Paragraph C of Listings 12.04 and 12.06 satisfied, the ALJ

concluded that Plaintiff's mental impairments did not meet or medically equal the criteria of

those Listings.  (R. at 15-16.)  Substantial evidence supports the ALJ's step-three conclusions.

### 1.    *Plaintiff's Objective Medical Records Support the ALJ's Step-Three Conclusions.*

Plaintiff has a lengthy medical record spanning from 1997 to 2017, a substantial portion

of which describes Plaintiff's condition from before his alleged onset date of May 28, 2010.  (R.

at 486.)  A review of the entire medical record provides substantial evidence to support the

ALJ's step-three conclusions.

For one, Plaintiff's records support the ALJ's finding that Plaintiff experienced only

moderate limitations in his ability to understand, remember or apply information.  (R. at 15.)

Plaintiff's physicians and psychiatrists repeatedly reported that Plaintiff demonstrated normal or

intact memory.  (R. at 773, 867-68, 880, 882, 886, 898, 914-15, 988.)  Plaintiff also exhibited the

ability to process thoughts logically and without limitation.  (R. at 869 (noting "organized"

thought processes in June 2013), 870 (same in April 2013), 880 (same in November 2013), 881

(same in January 2014), 886 (noting "intact" thought processes in March 2015), 914-15 (noting

"logical" thought processes at four appointments between June 2012 and January 2013), 987 (noting normal thought processes in November 2016), 988 (same in August 2016).) And Plaintiff retained reality-based thought content with no signs of hallucinations or delusions throughout his psychiatric treatment. (R. at 867-68, 870, 879-81.) Importantly, although Plaintiff sometimes displayed slowed psychomotor functioning, the longitudinal record reveals that Plaintiff maintained generally normal and intact psychomotor capabilities. (R. at 867 (noting "normal" psychomotor functioning in August 2013), 868 (same in July 2013), 869 (same in June 2013), 870 (same in April 2013), 871 (same in March 2013), 879 (same in October 2013), 880 (noting "psychomotor retardation" in November 2013), 881 (noting "normal" psychomotor functioning in January 2014), 882 (noting "psychomotor retardation" in March 2014), 884 (noting "normal" psychomotor functioning in August 2014), 885 (same in December 2014), 886 (same in March 2015), 898 (same in November 2015), 899 (same in August 2015), 900 (same in June 2015), 987 (noting "ok" psychomotor functioning in November 2016), 988 (same in August 2016).) And, as the ALJ correctly noted, Plaintiff frequently exhibited fair to good judgment and insight. (R. at 15, 867-68, 880-83, 885-86, 898, 900, 914-15, 987-88.)

Plaintiff's treatment records likewise bolster the ALJ's finding of moderate limitation in Plaintiff's ability to interact with others. (R. at 15.) As the ALJ correctly noted, Plaintiff's physicians and psychiatrists repeatedly described him as cooperative. (R. at 15, 730, 885, 898-900, 987-88, 1001.) Plaintiff also exhibited appropriate eye contact throughout the record. (R. at 882-83, 885-86, 898-900, 1001.) And, on April 4, 2017, Plaintiff's psychiatrist noted that Plaintiff could speak logically and articulately, and that Plaintiff understood boundaries. (R. at 1001.)

As to Plaintiff's ability to maintain concentration, persistence and pace, Plaintiff's physicians and psychiatrists frequently described his concentration as fair or good. (R. at 867-68, 879-81.) Plaintiff also appeared alert or oriented during nearly every appointment on record. (R. at 642-43, 649, 670, 674, 679, 681, 688, 696, 698, 704, 710, 863, 869-70, 882-83, 898-99, 987-88, 1001.) And, as mentioned, Plaintiff repeatedly demonstrated normal and intact memory, (R. at 773, 867-68, 880, 882, 886, 898, 914-15, 988), and generally normal psychomotor functioning, (R. at 867-71, 879-82, 884-86, 898-900, 987-88).

Plaintiff's medical records also support the ALJ's finding of only a moderate limitation in Plaintiff's ability to adapt and manage himself, the final Paragraph B criterion. (R. at 16.) As the ALJ mentioned, Plaintiff most often appeared in appropriate attire with good hygiene. (R. at 867 (noting "appropriate" appearance in August 2013), 868 (same in July 2013), 881 (same in January 2014), 884 (noting "neat" appearance in August 2014), 885 (noting "clean" appearance in December 2014), 899 (noting "casual" appearance in August 2015), 900 (same in June 2015), 987 (same in November 2016).) Plaintiff also told James Sanderlin, M.D., that he could dress, bathe and feed himself, and occasionally load the dishwasher. (R. at 862.)

As to Paragraph C of Listings 12.04 and 12.06, Plaintiff's records sustain the ALJ's determination that Plaintiff could adjust to demands outside of his daily life. (R. at 16.) Indeed, Plaintiff's medical records mention Plaintiff's pursuit of a new career after developing arthritis in his right thumb from his mechanic work. (R. at 723 (noting that Plaintiff had decided to return to school to study computers), 773 (noting that Plaintiff had started school to study computers).) Importantly, very little in Plaintiff's medical records suggest that Plaintiff could not adjust more than marginally to external stressors.

14

## 2. *The Mental Health Opinions of Record Support the ALJ's Step-Three Conclusions.*

The record contains several medical opinions addressing Plaintiff's mental abilities, most of which support the ALJ's conclusion that Plaintiff's mental impairments did not meet or medically equal the criteria of Listings 12.04 and 12.06. (R. at 15-16.) On May 24, 2012, one of Plaintiff's treating psychiatrists, Dr. Koduru, issued a one-page letter stating that Plaintiff suffered from major recurrent depression and generalized anxiety disorder. (R. at 806.) Dr. Koduru opined that Plaintiff's conditions had not improved despite taking several anti-anxiety and anti-depressant medications. (R. at 806.) Based on this prognosis, Dr. Koduru concluded that Plaintiff "[was] unable to hold any kind of job." (R. at 806.)

On August 10, 2013, Plaintiff underwent a mental status examination with state agency consultative psychologist, Rebecca Fromme, Ph.D. (R. at 873-76.) Dr. Fromme observed that Plaintiff drove himself to the appointment, arriving on time. (R. at 873.) Plaintiff's gait and posture both appeared "unremarkable." (R. at 873.) Dr. Fromme described Plaintiff's hygiene and posture as "good," and Plaintiff appeared in appropriate dress. (R. at 873.)

During the examination, Plaintiff reported that his prescriptions of Prozac, Trazodone and Klonipin "help[ed] him 'some.'" (R. at 873.) During a typical day, Plaintiff stated that he watched TV and ate. (R. at 874.) Other than occasionally cutting the grass, Plaintiff denied performing household chores. (R. at 874.) Although he complained of having difficulty sleeping at night, Plaintiff stated that he often slept during the day. (R. at 873-74.) Plaintiff further denied problems with maintaining his hygiene and grooming. (R. at 874.) Socially, Plaintiff denied having friends after leaving his job as a mechanic. (R. at 874.) Plaintiff reported that he could manage his own money and drive himself as needed. (R. at 874.)

In relaying his social and occupational history, Plaintiff explained that he graduated from high school without any grade repetitions or special education classes. (R. at 874.) Plaintiff had married once and remained married to the same woman. (R. at 874.) Plaintiff had two children, ages six and eleven at the time, with whom he felt distanced because of his impairments. (R. at 874.) Plaintiff noted that he most recently worked as a mechanic at Goodyear, a job he held for twelve years. (R. at 874.)

Dr. Fromme observed that Plaintiff appeared alert, cooperative and pleasant. (R. at 874.) Plaintiff maintained "fair" eye contact and had "normal" affect, though Plaintiff had a "dysphoric" mood. (R. at 874.) Dr. Fromme recorded that Plaintiff spoke coherently, with normal rate and volume. (R. at 874.) Plaintiff further exhibited "relevant, linear, and well-organized" thought processes, and Dr. Fromme observed that Plaintiff could follow the conversation. (R. at 874.) Dr. Fromme found no evidence of impulsivity or hypervigilance. (R. at 874.) And Plaintiff demonstrated "good" social skills, no evidence of grandiosity or expansiveness, and a polite and calm disposition. (R. at 874-75.) Dr. Fromme described Plaintiff's memory as "intact," with a normal fund of knowledge. (R. at 875.) And, although Plaintiff's MOCA score (20) indicated lower cognitive functioning, Dr. Fromme believed that Plaintiff put forth less-than-full effort on some parts of the assessment, invalidating the results. (R. at 875.) Indeed, on other cognitive assessments, Dr. Fromme noted that Plaintiff performed better. (R. at 875.) For example, Plaintiff correctly calculated five out of five Serial Sevens. (R. at 875.) Overall, Dr. Fromme concluded that Plaintiff's cognitive functioning fell within normal limits. (R. at 875.)

Based on her observations, Dr. Fromme opined that Plaintiff's right-thumb pain primarily limited his ability to work and concluded that Plaintiff could work in jobs that did not require

manual dexterity. (R. at 875.)  In fact, Dr. Fromme believed that Plaintiff's unemployment worsened his mood and that gainful employment would improve Plaintiff's mental health. (R. at 875-76.)  Dr. Fromme further noted that Plaintiff would not require additional supervision and could follow instructions. (R. at 876.)  And Dr. Fromme believed that Plaintiff could independently manage his affairs. (R. at 876.)

During the SSA's initial consideration of Plaintiff's DIB claim, on August 21, 2013, Donald K. Bruce, Ph.D., assessed Plaintiff's mental impairments. (R. at 174-75.)  Based on Plaintiff's records, Dr. Bruce opined that Plaintiff's mental impairments under Listings 12.04 and 12.06 caused only moderate limitations in Plaintiff's activities of daily living, social functioning and ability to maintain concentration, persistence and pace. (R. at 175.)  Dr. Bruce further found no evidence of decompensation episodes. (R. at 175.)  As to the Paragraph C criteria in the Listings, Dr. Bruce concluded that the "[e]vidence d[id] not establish the presence of the 'C' criteria" under either Listing. (R. at 175.)

Dr. Bruce then made findings regarding Plaintiff's mental RFC. (R. at 177-79.)  Dr. Bruce found no significant limitation in Plaintiff's ability to remember locations and work-like procedures and to understand, remember and carry out very short and simple instructions, but Dr. Bruce found moderate limitation in Plaintiff's ability to understand, remember and carry out more detailed instructions and to maintain attention and concentration for extended periods. (R. at 177-78.)  Plaintiff also experienced moderate limitation in his ability to maintain a schedule and regular attendance and punctuality. (R. at 178.)  Dr. Bruce found no significant limitation in Plaintiff's ability to sustain an ordinary routine, work in coordination with or in proximity to others without distraction and to make simple, work-related decisions. (R. at 178.)  However, Dr. Bruce explained that Plaintiff's memory and aggravation could moderately hinder his

17

persistence and pace, causing some interruption to Plaintiff's workweek. (R. at 178.) Socially, Dr. Bruce found no significant limitation in Plaintiff's ability to interact appropriately with the public, maintain socially appropriate behavior or ask simple questions and request assistance, though Dr. Bruce noted moderate limitation in Plaintiff's ability to accept instructions and respond to criticism from supervisors. (R. at 178.) In the workplace, Dr. Bruce opined that Plaintiff could get along with co-workers or peers without distracting them or exhibiting "behavioral extremes." (R. at 178.) And Dr. Bruce observed only moderate limitation in Plaintiff's ability to respond appropriately to changes in his work environment and no limitation in Plaintiff's ability to adapt to normal hazards, travel to unfamiliar places, use public transportation or independently establish realistic goals and plans. (R. at 179.)

During reconsideration of Plaintiff's claim, on December 26, 2013, a second consultative psychiatrist, Howard S. Leizer, Ph.D., assessed Plaintiff's mental status. (R. at 193.) Like Dr. Bruce, Dr. Leizer considered Plaintiff's mental impairments under Listings 12.04 and 12.06 and found that Plaintiff's impairments only moderately limited his daily activities, social functioning and concentration, persistence and pace, with no evidence of decompensation episodes. (R. at 193.) Dr. Leizer also concurred with Dr. Bruce that the "[e]vidence d[id] not establish the presence of the 'C' criteria." (R. at 194.)

Dr. Leizer conducted his own mental RFC assessment, agreeing with Dr. Bruce that Plaintiff experienced no significant limitations in his ability to remember locations and work-like procedures and to understand, remember and carry out very short and simple instructions. (R. at 196.) However, like Dr. Bruce, Dr. Leizer found Plaintiff moderately limited in his ability to understand, remember and carry out more detailed instructions, and to maintain concentration and attention for extended periods. (R. at 196.) Dr. Leizer agreed with Dr. Bruce that Plaintiff's

impairments moderately limited his ability to maintain a schedule, attendance and punctuality. (R. at 196.) Dr. Leizer found no significant limitation in Plaintiff's ability to sustain an ordinary routine, work in coordination with or in proximity to others without distraction and to make simple, work-related decisions. (R. at 196.) And Dr. Leizer concurred with Dr. Bruce that Plaintiff's memory and aggravation would moderately limit Plaintiff's ability to complete a normal workday and workweek without interruption. (R. at 196.) Socially, Dr. Leizer noted no significant limitation in Plaintiff's ability to interact with the public, ask simple questions and request assistance, but Dr. Leizer found that Plaintiff had moderate limitation in his ability to accept instructions and respond to criticism from supervisors. (R. at 197.) Dr. Leizer further found that Plaintiff could maintain acceptable behavior and adhere to basic standards of neatness without limitation. (R. at 197.) In the workplace, Dr. Leizer opined that Plaintiff could get along with co-workers and peers without distracting them or exhibiting "behavioral extremes." (R. at 197.) And Dr. Leizer recorded only moderate limitation in Plaintiff's ability to respond appropriately to changes in his work environment and no limitation in Plaintiff's ability to take precautions to avoid hazards, travel to unfamiliar places, use public transportation and set independent goals and plans. (R. at 197.) Ultimately, Dr. Leizer opined that Plaintiff's mental impairments "d[id] not preclude the claimant from meeting the basic mental demands of competitive work on a sustained basis." (R. at 197.)

On May 1, 2015, Plaintiff's psychiatrist, Dr. Ettigi, completed a Mental Assessment for Work-Related Activities on Plaintiff's behalf. (R. at 890-96.) During this assessment, Dr. Ettigi noted that Plaintiff had a limited but satisfactory ability to follow work-related rules. (R. at 890.) However, Dr. Ettigi found that Plaintiff's impairments seriously limited, but did not preclude, his ability to relate to co-workers, use judgment with the public, interact with supervisors, function

independently and maintain attention. (R. at 890.)  And Dr. Ettigi concluded that Plaintiff had no

useful ability to deal with the public or handle work stresses. (R. at 890.)  Dr. Ettigi based these

findings on Plaintiff's general anxiousness and agitation. (R. at 890.)  Dr. Ettigi further found

that Plaintiff experienced serious limitations in his ability to understand, remember and perform

detailed and complex job instructions, but Dr. Ettigi found that Plaintiff could satisfactorily

follow simple job instructions. (R. at 891.)  Dr. Ettigi recorded that Plaintiff could maintain his

appearance and behave in a stable manner, but he found serious limitation in Plaintiff's ability to

relate predictably in social situations and demonstrate reliability. (R. at 891.)  Notably, Dr. Ettigi

agreed with Dr. Bruce and Dr. Leizer that Plaintiff could manage money in his own best interest.

(R. at 892.)  Finally, in considering whether Plaintiff met the criteria of Listings 12.04 and 12.06,

Dr. Ettigi marked that Plaintiff's impairments met the requirements of Paragraphs B and C under

both Listings. (R. at 894, 896.)

On February 25, 2016, Dr. Ettigi completed a mental RFC evaluation of Plaintiff. (R. at

969-74.)  In his assessment, Dr. Ettigi opined that Plaintiff had a "fair to poor" response to his

treatments and gave Plaintiff a poor prognosis. (R. at 969.)  Dr. Ettigi recorded that Plaintiff

could not maintain competitive standards in nearly every area of mental functioning, including:

(1) remembering work-like procedures; (2) maintaining attention in two-hour intervals; (3)

maintaining attendance and punctuality; (4) sustaining a routine; (5) working with others; (6)

making simple, work-related decisions; (7) completing a normal workday and workweek without

interruption; (8) performing at a consistent pace; (9) accepting instructions; (10) getting along

with co-workers; (11) responding to changes in routine; (12) dealing with normal work stress;

and, (13) taking precautions to avoid hazards. (R. at 971.)  Dr. Ettigi further found serious

limitation in Plaintiff's ability to understand and remember very short and simple instructions

and ask simple questions or request assistance. (R. at 971.) Dr. Ettigi based his findings on Plaintiff's "extreme anxiety" and panic attacks and inability to "carry on day-to-day activities at home." (R. at 971.) Dr. Ettigi likewise found that Plaintiff could not maintain competitive standards in understanding, remembering and carrying out detailed instructions, setting realistic goals, making independent plans and dealing with the stress of skilled and semiskilled work. (R. at 972.) Socially, Dr. Ettigi found that Plaintiff could not maintain competitive standards in interacting with the public, acting in a socially appropriate manner, adhering to basic standards of neatness and cleanliness, traveling to unfamiliar places and using public transportation. (R. at 972.) Dr. Ettigi concluded that Plaintiff had marked limitations in his activities of daily living, social functioning and ability to maintain concentration, persistence and pace. (R. at 973.) However, Dr. Ettigi maintained that Plaintiff could nonetheless manage benefits in his own interest. (R. at 974.)

On March 10, 2017, Dr. Brehmer, Plaintiff's primary care physician, issued a one-page opinion, declaring that Plaintiff suffered from "disabling anxiety and panic disorders that [had] prevented employment and re-training." (R. at 990.) Dr. Brehmer opined that Plaintiff's psychiatric issues failed to respond to medicative treatment and that Plaintiff could not work unless and until his mental health improved. (R. at 990.)

During Plaintiff's hearing on August 17, 2017, the ALJ also heard the opinion of Dr. Freemont, a ME asked to review the entirety of Plaintiff's records and offer his opinion on Plaintiff's mental capacity. (R. at 137.) Dr. Freemont noted Plaintiff's history of depression, anxiety and dysthymia, as well as one instance of panic attacks during the relevant period. (R. at 138.) Dr. Freemont testified that Plaintiff's impairments did not satisfy the criteria of Listings 12.04 and 12.06. (R. at 139.) Dr. Freemont explained that Plaintiff's memory and thought

21

processes remained intact throughout his medical records. (R. at 139.) Dr. Freemont also discounted Dr. Ettigi's finding that Plaintiff exhibited hyperactive vigilance and scanning, as such symptoms indicated paranoia, which no other psychiatrists observed. (R. at 140.) Dr. Freemont likewise discredited Dr. Ettigi's findings regarding Plaintiff's disturbed thought content, noting that Plaintiff's records established that he could think normally and logically, with no perceptual disturbances. (R. at 141.) Moreover, when questioned about records indicating that Plaintiff reported only marginal improvement despite increased doses of multiple psychiatric medications, Dr. Freemont explained that Plaintiff's lack of effort on Dr. Fromme's cognitive assessments suggested a broader pattern of non-cooperation and deceptiveness by Plaintiff in reporting on the status of his mental health. (R. at 143-44, 875.) In support of this hypothesis, Dr. Freemont cited to multiple records showing that Plaintiff maintained intact memory and thought processes under medicative treatment. (R. at 144.)

As to Plaintiff's RFC, Dr. Freemont opined that Plaintiff had a poor capacity to understand, remember and carry out complex job instructions and had only a fair capacity to understand, remember and carry out detailed job instructions. (R. at 141.) However, Dr. Freemont opined that Plaintiff could understand, remember and carry out simple instructions. (R. at 141.) Dr. Freemont gave Plaintiff a rating of "fair" for his ability to interact with the public, co-workers and supervisors, adding that any limitation in this area would not stop Plaintiff from working. (R. at 141.)

Plaintiff's attorney-representative pressed Dr. Freemont on his RFC findings, asking whether he believed Plaintiff could summon the motivation to leave his home and maintain regular attendance at work. (R. at 145.) In response, Dr. Freemont opined that, in his experience, waiting for a depressed patient to feel better left both patient and psychiatrist waiting

22

for "a very long time." (R. at 145.)  Instead, Dr. Freemont insisted that Plaintiff's mental health would improve if he slowly started to engage in society.  (R. at 145.)

Considered in balance, these medical opinions provide further support for the ALJ's conclusion that Plaintiff failed to establish disability under either Listing 12.04 or Listing 12.06. (R. at 15-16.)  Indeed, the findings of both Dr. Bruce and Dr. Leizer directly support the ALJ's conclusion that Plaintiff experienced only moderate limitation in his ability to understand, remember and apply information, interact with others and maintain concentration, persistence and pace.  (R. at 15-16, 175, 193.)  Both psychiatrists also noted no significant limitation in Plaintiff's ability to carry out short and simple instructions and only moderate limitation when it came to more detailed instructions, further supporting the ALJ's step-three determinations.  (R. at 178, 196.)  And both Dr. Bruce and Dr. Leizer determined that Plaintiff could socialize with the public, co-workers and peers without resorting to "behavioral extremes." (R. at 178, 197.)

Dr. Fromme's findings likewise support the ALJ's step-three conclusions, noting that Plaintiff had good hygiene, appropriate dress and "fair" eye contact.  (R. at 873-74.)  Plaintiff could also follow along with Dr. Fromme's conversation, and Dr. Fromme described Plaintiff's social skills as "good," adding that Plaintiff exhibited a "polite" and "calm" demeanor.  (R. at 874-75.)  And, although Plaintiff had a low MOCA score, as the ALJ correctly noted, Dr. Fromme invalidated this score because of Plaintiff's less-than-full participation.  (R. at 15, 875.)

Ultimately, Drs. Brehmer, Ettigi and Koduru issued the only psychiatric opinions that weighed against the ALJ's step-three findings.  However, as Dr. Freemont noted, Dr. Ettigi's severely limiting conclusions ignored the greater weight of the entire record, which indicated that Plaintiff maintained intact memory and concentration, good eye contact and cooperative

23

behaviors — a fact that the ALJ later pointed out in her opinion.[8]  (R. at 22, 140-41, 773, 867-68, 880, 882, 886, 898, 914-15, 988.)  And Dr. Koduru's one-page opinion contradicted his own treatment notes, which showed improvement in Plaintiff's condition after taking medication.  (R. at 807 (May 1, 2012 notes indicating "Klonopin helping"), 808 (April 2, 2012 notes indicating "still anxious but Klonopin helping"), 810 (June 2, 2011 notes indicating "medication helping"), 811 (April 4, 2011 notes indicating "Klonopin helping"), 812 (February 9, 2011 notes indicating "[Plaintiff] claim[s] that Prozac is helping" and March 11, 2011 notes indicating "Klonopin is helping some"), 813 (November 30, 2010 notes indicating that Plaintiff's "depression is improving"), 819 (January 3, 2005 notes indicating that Plaintiff's "depression is improving" and "[medication] is helping"), 820 (October 21, 2004 notes indicating "anxiety is improving").)  Dr. Brehmer's one-page opinion similarly contradicted the evidence of record and lacked a function-by-function analysis to support Dr. Brehmer's conclusory findings.  In any case, even assuming the opinions of Drs. Brehmer, Ettigi and Koduru provided substantial evidence to find Plaintiff disabled under Listings 12.04 and 12.06, the law requires the Court to affirm the ALJ's decision when, as here, substantial evidence also supports the ALJ's conclusions.  *Clarke*, 843 F.2d at 272-73.

### 3.    *Plaintiff's Statements Support the ALJ's Step-Three Conclusions.*

The ALJ took Plaintiff's testimony into account in reaching his step-three conclusions. Specifically, when addressing Plaintiff's ability to interact with others, the ALJ noted Plaintiff's statements about having no social life and limited time outside.  (R. at 15.)  However, the ALJ

---

[8]    Additionally, to the extent that Dr. Ettigi opined that Plaintiff's impairments met the criteria of Listings 12.04 and 12.06, the Court notes that ALJs need not afford controlling weight to such opinions.  20 C.F.R. § 404.1527(d)(2) (reserving to the Commissioner the question of whether a claimant's impairments meet the criteria under the Listings); SSR 96-5p.

remarked that Plaintiff's treating physicians and psychiatrists repeatedly described him as cooperative, pleasant and polite — a finding that the record supports. (R. at 15, 730, 885, 898-900, 987-88, 1001.) And Plaintiff's testimony regarding his social life proves internally inconsistent as well. In 2013, Plaintiff initially stated that he went out "a few times" a week but changed the frequency to only once a week in August 2017, with no intervening change in his medical status to support such a decrease. (R. at 151, 510.) In 2013, Plaintiff also stated that he had never lost a job because of his inability to get along with others. (R. at 513.) Although Plaintiff's temperament could have changed as time progressed, as the ALJ noted, Plaintiff's longitudinal record suggests a relatively consistent friendly demeanor. (R. at 15, 730, 885, 898-900, 987-88, 1001.)

The ALJ also considered Plaintiff's testimony in finding that Plaintiff's impairments moderately limited his ability to maintain concentration, persistence and pace. (R. at 15-16.) Specifically, the ALJ referred to Plaintiff's 2013 Function Report, in which Plaintiff complained of problems concentrating, feeling slowed down and body aches. (R. at 15, 512.) The ALJ weighed these complaints against Dr. Fromme's finding that Plaintiff had normal cognitive functioning and found Dr. Fromme's objective opinion more convincing — a finding that the record supports. (R. at 15-16, 867-71, 875, 879-81, 884-86, 898-900, 987-88.)

As to Plaintiff's ability to adapt and manage himself, Plaintiff's testimony further substantiates the ALJ's finding that Plaintiff experienced only moderate limitations. (R. at 16.) As the ALJ correctly noted, Plaintiff testified to bathing himself and changing his own clothing, though only once or twice a week. (R. at 16, 85, 114-15.) And, as the ALJ mentioned, the objective medical records indicated that Plaintiff's appearance often fell within normal

25

expectations, undermining Plaintiff's statements about his poor hygiene. (R. at 16, 867-68, 881, 884-85, 899-900, 987.)

Ultimately, the ALJ adequately addressed contradictions between Plaintiff's testimony and the other evidence of record, giving Plaintiff's testimony credit when it appeared consistent with the objective medical evidence. Accordingly, the ALJ did not err.

**B.      Substantial Evidence Supports the ALJ's Finding that Plaintiff's Statements Concerning the Intensity, Persistence and Limiting Effects of His Symptoms Proved Inconsistent with the Evidence of Record.**

In his motion for summary judgment, Plaintiff states briefly that "[his] symptoms and testimony are consistent with [his] lengthy medical records," (Pl.'s Mem. at 2), which the Court construes as a challenge to the ALJ's determination that Plaintiff's statements proved inconsistent with the evidence of record. Defendant responds that substantial evidence supports the ALJ's treatment of Plaintiff's statements, because the ALJ provided an adequate explanation for her conclusions and substantial evidence supports the ALJ's findings. (Def.'s Mem. at 23-24.)

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 404.1520(e)-(f), 404.1545(a)(1). The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's consistent complaints. As of March 28, 2016, the ALJ must follow a revised two-step analysis in reviewing a claimant's subjective complaints. 20 C.F.R. §§ 404.1529(a); SSR 16-3p. The first step requires the ALJ to determine whether there is an underlying medically determinable physical or mental impairment or impairments that reasonably could produce the individual's pain or other related symptoms. SSR 16-3p, at 3. If the underlying impairment

reasonably could be expected to produce the individual's pain, then the second part of the analysis requires the ALJ to evaluate a claimant's "symptoms such as pain and determine the extent to which an individual's symptoms limit his or her ability to perform work related activities." *Id.* at 4. The ALJ's step-two evaluation must first consider the consistency between a claimant's statements and the objective medical evidence. *Id.* at 5. Unless the ALJ can determine that a claimant qualifies as disabled based solely on objective medical evidence, the ALJ must also consider other sources of evidence to determine consistency, including "statements from the [claimant], medical sources, and other sources that might have information about the [claimant's] symptoms." *Id.* at 5-7. Based on the degree of consistency between a claimant's statements and the evidence of record, the ALJ should find either a higher or lower likelihood that the claimant can perform work-related activities. *Id.* at 8.

Furthermore, it is well established that Plaintiff's subjective allegations of pain are not, alone, conclusive evidence that Plaintiff qualifies as disabled. *Mickles v. Shalala*, 29 F.3d 918, 919 (4th Cir. 1994). The Fourth Circuit has determined that "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Craig*, 76 F.3d at 591.

Here, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms, but that Plaintiff's statements regarding the intensity, persistence and limiting effects of his symptoms "[were] not entirely consistent with the medical evidence and other evidence in the record." (R. at 17.)

As to Plaintiff's complaints of pain in his right hand, the ALJ outlined inconsistencies between Plaintiff's statements and the objective medical evidence. (R. at 17.) For example, in

27

May 2010, Plaintiff complained of pain in his right hand; however, on examination, Plaintiff's physician recorded no obvious swelling, reddening or bruising and no pain with movement. (R. at 17, 670.) And an x-ray of Plaintiff's hand revealed no abnormalities. (R. at 17, 670.) After receiving conservative treatment in the form of a thumb splint and anti-inflammatory medication, Plaintiff reported some improvement. (R. at 670.) By June 2010, Plaintiff's orthopedist noted excellent range of motion in Plaintiff's right thumb, hand and wrist, though Plaintiff exhibited some tenderness. (R. at 734.) The ALJ also cited to an MRI of Plaintiff's right hand in September 2010, which revealed a "vascular malformation, fat necrosis or contusion" around Plaintiff's right thumb, but otherwise showed no abnormalities. (R. at 18, 729, 735.) And Plaintiff's monthly follow-ups showed a generally stable condition throughout 2011. (R. at 18, 720, 723-27.) In fact, in November 2011, Plaintiff's orthopedist remarked that Plaintiff's right hand had "significantly" improved since Plaintiff stopped working as a mechanic. (R. at 774.)

The ALJ took particular note of Plaintiff's refusal to undergo intrusive procedures, such as injections and surgery, to fix his right thumb. (R. at 18, 723-24, 726-29, 733, 772.) Indeed, on multiple occasions, Plaintiff stated that he could not afford surgery under his high-deductible plan, but also refused less costly injections despite advice from his orthopedist that more intrusive treatment would be necessary for his condition to improve. (R. at 723-24, 726-29, 733, 772.) After Plaintiff again rejected surgical intervention in May 2012, Plaintiff's orthopedist ordered that he remain on light-duty indefinitely with over-the-counter anti-inflammatories to treat pain. (R. at 772.) Thereafter, from 2014 through his date last insured, Plaintiff sought no significant treatment for his hand, which the ALJ aptly noted. (R. at 18.)

The ALJ also found inconsistencies between Plaintiff's complaints of right-thumb pain and the consultative examination performed by James Sanderlin, M.D. (R. at 18, 861-64.) The

ALJ noted that Plaintiff complained to Dr. Sanderlin of tenderness in his right thumb and metacarpophalangeal joint, but observed that Plaintiff also denied significant swelling and stated that he took over-the-counter medications with some pain relief. (R. at 18, 862.) And the ALJ reiterated Dr. Sanderlin's findings that Plaintiff had normal gait, station and coordination, with full range of motion and motor strength. (R. at 18, 863.)

The ALJ then considered the opinion of Nancy Powell, M.D., another state agency consultative physician, who examined Plaintiff in May 2016. (R. at 18, 979-82.) The ALJ remarked that Plaintiff's chief complaints during that examination related to his psychiatric condition, not his hand. (R. at 18, 979.) And the ALJ reiterated Dr. Powell's findings that Plaintiff could walk from the waiting room to the examination room without difficulty, sit and get on and off the examination table without assistance, and go from lying down to sitting without limitation. (R. at 18, 980.) Dr. Powell further recorded that Plaintiff had normal gait and coordination, with full range of motion, grip and motor strength. (R. at 18, 981.)

Taking these inconsistencies into account and describing the entire medical record, the ALJ concluded that Plaintiff's positive right thumb grind tests between 2010 and 2012, balanced with consistent descriptions of Plaintiff's normal coordination, gait, grip and motor strength, supported the ALJ's ultimate RFC finding that Plaintiff could frequently, though not constantly and repeatedly, grasp, handle and finger with his right hand. (R. at 16, 18.) The ALJ added that Plaintiff's own testimony reinforced her conclusions, citing to Plaintiff's statements about using utensils, opening jars and buttoning buttons, and his testimony that he could sit for one to two hours, stand for two to three hours and walk up to four-tenths of a mile. (R. at 18, 84, 153-54.) Finally, the ALJ considered Plaintiff's testimony that he could lift only five pounds with his right hand and a gallon of milk with his left, finding that this testimony proved inconsistent with

29

medical documentation showing full motor and grip strength and full range of motion.  (R. at 18, 84, 734, 863, 981.)

   As to Plaintiff's statements about the intensity of his anxiety and depression, the ALJ again noted inconsistencies between Plaintiff's statements and the evidence of record.  (R. at 19.) The ALJ first outlined Plaintiff's psychiatric treatment during the relevant period.  (R. at 19.) The ALJ noted Dr. Koduru's October 2010 diagnosis of depression and generalized anxiety disorder and his bimonthly follow-ups with Plaintiff through May 2012, at which time Dr. Koduru concluded that Plaintiff's medicative treatment had produced only modest improvement in Plaintiff's condition.  (R. at 19, 806-13.)  The ALJ compared these findings with Plaintiff's psychiatric examinations from 2013 to 2016, which noted generally normal mental functioning, clean appearance, relevant thought content and organized thought processes despite Plaintiff's consistently depressed mood and sad affect.  (R. at 19, 867-68, 880-83, 885-86, 898, 900, 914-15, 987-88.)  The ALJ again cited to Dr. Sanderlin's July 2013 consultative examination, during which Plaintiff reported that Vilbryd and clonazepam improved his condition.  (R. at 19, 862.) And the ALJ cited to Dr. Sanderlin's description of Plaintiff as alert and oriented with comprehensible speech.  (R. at 19, 862.)

   The ALJ then outlined the findings from Plaintiff's August 2013 consultative examination with Dr. Fromme, who, as mentioned, described Plaintiff's grooming and hygiene as "good" and dress as "appropriate."  (R. at 19, 873.)  During this examination, Plaintiff again reported some relief after taking prescription medications, which the ALJ noted.  (R. at 19, 873.) And the ALJ outlined Dr. Fromme's findings that Plaintiff appeared alert, cooperative and pleasant, with fair eye contact and normal and appropriate affect despite a "dysphoric" mood. (R. at 19, 874.)  The ALJ noted Dr. Fromme's observation that Plaintiff exhibited "relevant,

linear and well-organized" thought processes, with no signs of impulsivity or hypervigilance. (R. at 19, 874.) And, as to Plaintiff's low MOCA score, the ALJ adopted Dr. Fromme's conclusion that Plaintiff had put less-than-full effort into the assessment, invalidating his score. (R. at 19, 875.) The ALJ added that Plaintiff performed better on Dr. Fromme's other cognitive tests, correctly calculating five of five Serial Sevens. (R. at 19, 875.)

Continuing her analysis, the ALJ cited to Plaintiff's January 2014 appointment with Dr. Ettigi and A. Duke, N.P., during which Plaintiff exhibited appropriate appearance, normal speech, good concentration, intact memory, organized thought process, reality-based thought content, appropriate insight and good judgment. (R. at 19-20, 881.) Plaintiff also reported that he felt the same and asked to decrease his Prozac dosage. (R. at 19, 881.) The ALJ found that Plaintiff maintained a stable mental condition from his January 2014 appointment through his date last insured, which the records also support. (R. at 20, 882-86, 898-900, 987-88, 1001.) Indeed, as the ALJ remarked, even after Plaintiff's date last insured (September 30, 2016), in April 2017, Dr. Koduru recorded that Plaintiff demonstrated logical and articulate speech, good eye contact, cooperative behavior and good boundaries, despite remaining depressed, tense and fidgety. (R. at 20, 1001.)

Based on this evidence and other evidence of record, the ALJ concluded that Plaintiff lacked documented support for his statements regarding his panic attacks, lack of motivation and energy, and continued depression and anxiety. (R. at 20.) The ALJ added that Plaintiff's records supported the conclusion that Plaintiff could perform unskilled work with an SVP of no more than two in a non-production-oriented work setting. (R. at 20.) As evidence of Plaintiff's ability to understand and perform simple tasks, the ALJ cited to Plaintiff's ability, even with less-than-full effort, to correctly calculate five out of five Serial Sevens. (R. at 20.) And the ALJ

discredited Plaintiff's testimony about his inability to get along with others, citing to objective descriptions of Plaintiff's cooperative, pleasant and polite demeanor.  (R. at 20-21, 154, 159, 511, 730, 874, 885, 898-900, 987-88, 1001.)

Ultimately, the ALJ provided a detailed, narrative explanation of the inconsistencies between Plaintiff's statements regarding the intensity, persistence and limiting effects of his symptoms and the evidence of record.  Importantly, the ALJ cited to evidence in the record and fairly considered contrary findings, explaining why the overall record favored her conclusions. The Court's own review of the record finds substantial evidence to support the ALJ's reasoning. Accordingly, the ALJ did not err.

## C.   The ALJ Properly Applied the Treating Physician Rule to the Opinions of Drs. Brehmer, Ettigi and Koduru.

Plaintiff next argues that the ALJ erred by affording little to no weight to the opinions of his treating physicians and psychiatrists, Drs. Brehmer, Ettigi and Koduru.[9]  (Pl.'s Mem. at 2.) Specifically, Plaintiff suggests that the ALJ failed to properly apply the treating physician rule to the relevant opinions.  (Pl.'s Mem. at 2 (citing 20 C.F.R. § 404.1527).)  Defendant responds that the ALJ properly applied the treating physician rule.  (Def.'s Mem. at 25-26.)

During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment, or combination of impairments, that would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence

---

[9]    Although Plaintiff fails to specify which treating source opinions the ALJ improperly treated, the Court assumes that Plaintiff objects to the weight afforded to Drs. Ettigi, Koduru and Brehmer, as Plaintiff takes issues only with those opinions given "little to no weight," (Pl.'s Mem. at 2), and the rest of Plaintiff's treating source opinions received more than "little" weight, (R. at 22-24).

resulting from consultative examinations or medical expert evaluations that have been ordered. 20 C.F.R. §§ 404.1512, 404.1527.  When the record contains a number of different medical opinions, including those from Plaintiff's treating sources, consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence.  § 404.1527(c).  If, however, the medical opinions are inconsistent internally with each other or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved.  §§ 404.1527(c)(2)-(6), (d).

Under the regulations, only an "acceptable medical source" may be considered a treating source that offers an opinion entitled to controlling weight.  SSR 06-3p.[10]  Acceptable medical sources include licensed physicians, licensed or certified psychologists and certain other specialists, depending on the claimed disability.  §§ 404.1513(a), 404.1527(a).  The regulations also provide for the consideration of opinions from "other sources," including nurse-practitioners, physician's assistants or therapists.  § 404.1513(d).[11]

A treating source's opinion must be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record.  § 404.1527(c)(2); *Lewis v. Berryhill*, 858 F. 3d 858,867

---

[10]    Effective March 27, 2017, the SSA rescinded SSR 96-2p and 06-3p, instead incorporating some of the Rulings' policies into 20 C.F.R. §§ 404.1527(f).  82 Fed. Reg. 5844-01, at 5844-45, 5854-55 (Jan. 18, 2017).  Plaintiff filed his claim on March 12, 2013, before this regulation took effect.  (R. at 454.)  The Agency does not have the power to engage in retroactive rulemaking.  *Compare Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) (requiring Congress to expressly convey the power to promulgate retroactive rules due to its disfavored place in the law), *with* 42 U.S.C. § 405(a) (granting the Agency the general power to make rules, but not granting retroactive rulemaking power).  Because the regulation does not have retroactive effect, SSR 06-3p applies to Plaintiff's claim.

[11]    The regulations detail that "other sources" include medical sources that are not considered "acceptable medical sources" under 20 C.F.R. § 404.1513(a).  The given examples are a non-exhaustive list.

(4th Cir. 2017); *Craig*, 76 F.3d at 590; SSR 96-2p.  Further, the regulations do not require that the ALJ accept opinions from a treating source in every situation, *e.g.*, when the source opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the treating source's opinion is inconsistent with other evidence or when it is not otherwise well-supported.  §§ 404.1527(c)(3)-(4), (d).

Courts generally should not disturb an ALJ's decision as to the weight afforded a medical opinion absent some indication that the ALJ "dredged up 'specious inconsistences.'"  *Dunn v. Colvin*, 607 F. App'x 264, 267 (4th Cir. 2015) (citing *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992)).  Indeed, an ALJ's decision regarding weight afforded a medical opinion should be left untouched unless the ALJ failed to give a sufficient reason for the weight afforded.  *Id.*

The ALJ must consider the following when evaluating a treating source's opinion:  (1) the length of the treating source relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating source; and, (6) any other relevant factors.  §§ 404.1527(c).  However, those same regulations specifically vest the ALJ — not the treating source — with the authority to determine whether a claimant is disabled as that term is defined under the Act.  § 404.1527(d)(1).  Although the regulations explicitly apply these enumerated factors only to treating sources, those same factors may be applied in evaluating opinion evidence from "other sources."  SSR 06-03p.

Here, the ALJ considered the medical opinions of record and found both internal and external inconsistencies between the opinions and the other evidence of record.  (R. at 21-24.) Accordingly, the ALJ assigned varying degrees of weight to each opinion, explaining her reasoning for each assignment.  (R. at 21-24.)  The ALJ assigned "some but not great weight" to

the opinions of Dr. Ettigi, who, as previously discussed, opined that Plaintiff's impairments met the criteria of Listings 12.04 and 12.06 and concluded that Plaintiff could not maintain competitive standards in most areas of mental, social and occupational functioning. (R. at 22-23, 890, 894, 896, 971-73.) The ALJ explained that Dr. Ettigi's opinions as to the Listings contradicted the objective medical evidence of record, "including [Plaintiff's] ability to perform serial 7's without error, his generally intact memory and concentration, his mostly intact eye contact, and his cooperative and pleasant behavior." (R. at 22.) Indeed, Plaintiff's medical records detail repeated examinations during which Plaintiff exhibited these capabilities. (R. at 867-68, 875, 880-83, 885-86, 898, 900, 914-15, 987-88.)

As to Dr. Ettigi's February 2016 opinion that Plaintiff could not maintain competitive standards in most areas of functioning and would miss at least four days of work each month, the ALJ discredited Dr. Ettigi's conclusions, noting that Dr. Ettigi offered such extreme limitations only nine months after concluding that Plaintiff could follow work-related rules, remember simple instructions, maintain his appearance and manage his finances. (R. at 23, 890-92, 969-74.) The ALJ found no meaningful change in Plaintiff's condition that would warrant such an extreme diminution in Plaintiff's functional abilities. (R. at 23.) Indeed, in the timespan between Dr. Ettigi's first and second medical opinions, Plaintiff's medical records indicate that he displayed intact memory, normal psychomotor functioning, fair insight, cooperative behaviors and a casual appearance. (R. at 898-900.) And Plaintiff continued to exhibit fair to normal mental functions after Dr. Ettigi's severely limiting February 2016 opinion. (R. at 987 (noting "stable" mood, "fair" insight, "cooperative" behaviors and "normal" thought processes in November 2016), 988 (noting "ok" insight, judgment and psychomotor functioning in August 2016), 1001 (describing Plaintiff as "articulate," "logical" and "cooperative," with good eye

contact and good boundaries in April 2017).)  The above notwithstanding, the ALJ gave some weight to Dr. Ettigi's original opinion that Plaintiff could perform at least simple, repetitive work.  (R. at 22, 890-91.)

The ALJ assigned Dr. Koduru's opinion "little weight," explaining that Dr. Koduru's one-page letter lacked "specific work-related limitations or explanation as to how [Plaintiff's] severe depression and anxiety prevent[ed] him from holding a job."  (R. at 23.)  And the ALJ found that Dr. Koduru's conclusory and extreme findings contradicted the evidence of record, including the fact that Plaintiff could perform five out of five Serial Sevens, exhibited generally intact memory and concentration, maintained mostly intact eye contact and displayed cooperative and pleasant behaviors.  (R. at 23.)  The record supports the ALJ's findings, stating repeatedly that Plaintiff's memory, thought processes, concentration, eye contact and general demeanor and appearance fell well within normal expectations despite Plaintiff's consistent anxiety and depression.  (R. 867-68, 875, 880-83, 885-86, 898-900, 914-15, 987-88.)

The ALJ likewise afforded "little weight" to the opinion of Dr. Brehmer that Plaintiff suffered from disabling anxiety and panic disorders that prevented him from holding any job.  (R. at 23, 990.)  The ALJ discredited Dr. Brehmer's opinion, in part, because Dr. Brehmer did not specialize in psychiatry.  (R. at 23.)  Moreover, like Dr. Koduru, Dr. Brehmer's one-page opinion provided only conclusory findings, lacking a detailed function-by-function analysis.  (R. at 23.)  And the ALJ noted inconsistencies between Dr. Brehmer's conclusion that Plaintiff's psychiatric condition prevented him from working and the objective evidence showing that Plaintiff had sufficient mental capabilities to perform at least simple tasks.  (R. at 23, 867-68, 875, 880-83, 885-86, 898-900, 914-15, 987-88.)

36

Ultimately, in assessing the opinions of Plaintiff's treating physicians, the ALJ followed the requirements of the treating physician rule. § 404.1527. The ALJ explained why she afforded less than controlling weight for each treating source opinion, justifying her conclusions with citations to the evidence of record and the factors outlined in § 404.1527(c), including the nature of the source's relationship with Plaintiff, supportability based upon the medical record, consistency with the medical record and the source's specialization. (R. at 22-24.) Importantly, the ALJ's explanation proved sufficient to allow this Court to determine whether substantial evidence supports the ALJ's conclusions, which it does. Accordingly, the ALJ did not err.

### D.   Substantial Evidence Support the ALJ's Assignment of Great Weight to the Opinion of Dr. Freemont

Plaintiff argues that the ALJ also erred in affording great weight to the opinion of the ME, Dr. Freemont, who testified during Plaintiff's August 17, 2017 hearing. (Pl.'s Mem. at 2; R. at 23, 137-45.) Specifically, Plaintiff contends that Dr. Freemont demonstrated little knowledge of Plaintiff's medical records and made internally inconsistent statements during his testimony. (Pl.'s Mem. at 2.) Plaintiff cites to a December 11, 2017 letter sent by Plaintiff's wife to the Appeals Council, arguing that the ALJ improperly afforded Dr. Freemont's opinion great weight, because Dr. Freemont lacked board certification and had no treatment relationship with Plaintiff unlike Drs. Ettigi and Koduru. (Pl.'s Mem. at 2; R. at 602-03.) Plaintiff further takes issue with Dr. Freemont's testimony discrediting Dr. Ettigi's references to Plaintiff's paranoia-like symptoms, including vigilance and scanning. (Pl.'s Mem. at 2; R. at 140.) Plaintiff contends that Dr. Freemont ignored notes from a November 26, 2013 appointment indicating that Plaintiff acted obsessively, checked on things and appeared "preoccupied [that] something bad [was] going to happen." (Pl.'s Mem. at 2; R. at 880.) And Plaintiff argues that Dr. Freemont failed to

reference records from three appointments in April, May and June 2017, undermining Dr. Freemont's opinion. (Pl.'s Mem. at 2 (citing to R. at 997-1003).)

Defendant responds that Dr. Freemont failed to reference the April, May and June 2017 appointment records, because Dr. Freemont had no such records at the time of his testimony. (Def.'s Mem. at 29 (citing R. at 164).) Moreover, Defendant argues that such records prove irrelevant to Plaintiff's DIB claim, as they describe Plaintiff's condition outside the relevant period (i.e., after Plaintiff's date last insured of September 30, 2016). (Def.'s Mem. at 29.) As to Plaintiff's argument that Dr. Freemont ignored the November 26, 2013 appointment record describing paranoid tendencies, Defendant points out that such record made no definitive finding of paranoia and in fact noted that Plaintiff exhibited "reality based" thought content, supporting Dr. Freemont's assertion that the evidence of record discredited Dr. Ettigi's suggestion of paranoia. (Def.'s Mem. at 29 (citing R. at 880).) Moreover, Defendant points out that Plaintiff's argument impermissibly requires this Court to reweigh the evidence. (Def.'s Mem. at 29.)

The Court agrees with Defendant that it may not reweigh the evidence on judicial review. Instead, the Court must ask simply whether substantial evidence supports the weight afforded to Dr. Freemont's opinion. As mentioned, during Plaintiff's August 17, 2017 hearing, Dr. Freemont testified that Plaintiff had a poor capacity to understand, remember and carry out complex job instructions and had only a fair capacity to understand, remember and carry out detailed job instructions. (R. at 141.) However, Dr. Freemont believed that Plaintiff could understand, remember and carry out simple instructions. (R. at 141.) Dr. Freemont gave Plaintiff a rating of "fair" for his ability to interact with the public, co-workers and supervisors, adding that any limitation in this area would not stop Plaintiff from working. (R. at 141.)

38

The ALJ afforded Dr. Freemont's testimony "great weight," because "Dr. Freemont specialize[d] in psychology and reviewed all the medical evidence of record dated prior to [Plaintiff's] date last insured." (R. at 23.)  The ALJ further explained that Dr. Freemont's opinion proved consistent with the medical evidence of record, including evidence of Plaintiff's intact memory and concentration, ability to calculate five out of five Serial Sevens, mostly intact eye contact and cooperative and pleasant demeanor. (R. at 23.)  Substantial evidence supports the ALJ's findings.

As the ALJ correctly noted, Plaintiff's treatment records repeatedly describe Plaintiff's memory and judgment as fair or intact. (R. at 773, 867-68, 880, 882, 886, 898, 914-15, 988.)  Plaintiff's psychiatrists also consistently reported that Plaintiff had organized thought process and reality-based thought content. (R. at 869-70, 880-81, 886, 914-15, 987-88.)  And, with a few exceptions, Plaintiff demonstrated normal psychomotor functioning. (R. at 867-71, 879-81, 884-86, 898-900, 987-88.)  Plaintiff further exhibited normal eye contact and good or casual appearance throughout the relevant period. (R. at 867-68, 881, 884-85, 899-900, 987.)  And Plaintiff's treating physicians and psychiatrists described him as alert and oriented during nearly every appointment. (R. at 642-43, 649, 670, 674, 679, 681, 688, 696, 698, 704, 710, 863, 869-70, 882-83, 898-99, 987-88, 1001.)  Furthermore, although Plaintiff points to one appointment during which a treating provider noted paranoid behaviors, (R. at 880), one such mention fails to counter the overwhelming evidence supporting Dr. Freemont's opinion that Plaintiff could at least remember and carry out simple, work-related instructions. (R. at 141.)  And Plaintiff's contention that Dr. Freemont failed to reference the 2017 appointments likewise proves irrelevant to the Court's substantial evidence analysis.

Dr. Freemont's findings also concur with the other psychiatric opinions to which the ALJ afforded great weight.  Like Dr. Freemont, Drs. Fromme, Bruce and Leizer all found that Plaintiff could understand, remember and carryout simple, work-related instructions.  (R. at 141, 177-78, 196, 876.)  And all four doctors agreed that Plaintiff could interact with the public, co-workers and supervisors with only moderate limitations.  (R. at 141, 178, 197, 874-75.)

As to Plaintiff's attack on Dr. Freemont's credentials, the Court finds no legal grounds for excluding or demoting the opinion of a medical expert who lacks board certification.  In fact, the regulations contemplate situations in which the opinions of non-medical sources or sources without medical licensure could receive more weight than even treating sources.  *See* § 404.1527(a)-(f) (describing how the Commissioner will weigh medical and non-medical source evidence).  Because the ALJ properly explained the weight afforded to Dr. Freemont's opinion, and because substantial evidence supports the ALJ's determination, the ALJ did not err.

E.      **The ALJ Relied on the Proper Hypothetical to Reach Her Step-Five Conclusion.**

Plaintiff challenges the testimony of VE Robert Lester, who testified during Plaintiff's August 17, 2017 hearing.  (Pl.'s Mem. at 3.)  Specifically, Plaintiff takes issue with Mr. Lester's response to the ALJ's first hypothetical.  (Pl.'s Mem. at 3.)  Because the ALJ's first hypothetical proposed that the hypothetical individual had "poor" reliability, Plaintiff argues that Mr. Lester erred when he stated that such an individual could perform "simple, routine [and] repetitive types of work at the unskilled level."  (Pl.'s Mem. at 3; R. at 161.)  Plaintiff further contends that substantial evidence supports the third hypothetical presented to Mr. Lester, which described an individual who would be off task 20 percent of the workday.  (Pl.'s Mem. at 3; R. at 163.)  Because Mr. Lester responded that such an individual could perform no work in the national

economy, Plaintiff argues that the ALJ erred in reaching the opposite step-five conclusion. (Pl.'s Mem. at 3; R. at 25, 163.)

Defendant responds that the ALJ relied on the second hypothetical, which mirrored her RFC findings, to reach her step-five conclusion, rendering Plaintiff's challenge to the first hypothetical irrelevant. (Def.'s Mem. at 30.) As to the ALJ's decision to rely on the second hypothetical instead of the third, Defendant argues that the ALJ committed no error, because substantial evidence supports the ALJ's RFC findings and the second hypothetical mirrored those findings. (Def.'s Mem. at 30.)

At the fifth step of the sequential analysis, the Commissioner must show that, considering the claimant's age, education, work experience and RFC, the claimant could perform other work existing in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(g), 404.1566. The Commissioner can carry her burden in the final step with the testimony of a VE. § 404.1566(e). During an administrative hearing, the ALJ must pose hypothetical questions to the VE that accurately represent the claimant's RFC, so that the VE can offer testimony about any jobs existing in the national economy that the claimant could perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.*

Here, during Plaintiff's August 17, 2017 hearing, the ALJ posed three hypotheticals to the VE. (R. at 161-63.) First, the ALJ asked Mr. Lester to imagine an individual with "good ability to follow work rules" and poor ability to relate to co-workers, use judgment with the public and interact with supervisors. (R. at 161.) The ALJ added that the hypothetical individual would have poor ability to function independently and maintain attention and no ability to interact with the public or handle work stresses. (R. at 161.) The assumed individual would also

have poor ability to understand, remember and carryout complex and detailed job instructions, and a good ability to understand, remember and carryout simple job instructions. (R. at 161.) The assumed individual could maintain personal appearance and behave in an emotionally stable manner, but the individual would relate to others poorly and had poor reliability. (R. at 161.) Based on these functional limitations, the ALJ asked Mr. Lester whether the hypothetical individual could perform Plaintiff's past work, to which the ALJ responded: "No, ma'am." (R. at 161.) The ALJ then asked whether such an individual could perform work in the national economy, to which Mr. Lester answered: "I think [such an individual] could perform simple, routine, repetitive types of work at the unskilled level." (R. at 161.)

In her second hypothetical, the ALJ asked Mr. Lester to consider an individual who could lift and carry up to twenty pounds occasionally and up to ten pounds occasionally. (R. at 161-62.) The individual could sit for six hours and stand or walk for six hours in an eight-hour workday. (R. at 162.) The individual could also occasionally climb ramps and stairs, but could never climb ladders, ropes or scaffolds. (R. at 162.) The ALJ asked Mr. Lester to assume that the individual could occasionally balance, stoop and crouch, but could never kneel or crawl. (R. at 162.) The ALJ noted no limitations in the individual's use of his left hand, but stated that the individual could frequently, but not constantly or repetitively, grasp, handle and finger with his right, dominant hand. (R. at 162.) The individual would have to avoid exposure to all workplace hazards, including dangerous machinery and heights. (R. at 162.) And the individual could perform unskilled work or work with an SVP of no more than two in a non-production-oriented work setting, with no interaction with the public and no more than occasional interaction with co-workers and supervisors. (R. at 162.) Together, these limitations represented the ALJ's ultimate RFC findings. (R. at 16.) The ALJ asked Mr. Lester whether the second hypothetical

42

individual could perform Plaintiff's past work, which Mr. Lester denied. (R. at 162.) However, Mr. Lester affirmed that such an individual could perform light work, including the jobs of laundry sorter, router and cafeteria attendant. (R. at 162-63.)

In her third hypothetical, the ALJ asked Mr. Lester to assume the same individual described in her second hypothetical but with the added limitation that the individual would be off task 20 percent of the workday. (R. at 163.) The third individual would also be unable to interact with the public and could interact with co-workers and supervisors "on less than an occasional basis." (R. at 163.) Mr. Lester testified that such an individual could perform no work in the national economy, mainly because the individual would be off task 20 percent of the workday. (R. at 163.)

As to Plaintiff's first argument that Mr. Lester incorrectly testified that the individual in hypothetical one could perform work in the national economy, the Court finds Plaintiff's argument inapposite, because the ALJ did not rely on the first hypothetical to reach her step-five conclusion. (R. at 25.) Indeed, the first hypothetical made no mention of the limitations in the ALJ's ultimate RFC findings. (R. at 16, 161.) Rather, the ALJ's first hypothetical mirrored the findings of Dr. Ettigi, whose opinion the ALJ correctly afforded only some weight. (R. at 22-23, 969-74.) Because the ALJ discredited the first hypothetical as it related to Plaintiff's RFC, Plaintiff's challenge to that hypothetical rings hollow.

Plaintiff's argument that the ALJ should have relied on the third hypothetical likewise provides no grounds for remand. Plaintiff asks the Court to find that substantial evidence supports the third hypothetical and not the hypothetical relied on by the ALJ. However, as this Court has already discussed at length, substantial evidence supports the ALJ's explanation in support of her RFC findings and the findings themselves. Because substantial evidence supports

the ALJ's RFC findings, the Court finds that the ALJ properly relied on the second hypothetical, which mirrored the ALJ's RFC findings, to reach her step-five conclusion. Thus, the ALJ did not err.

### F.      No Grounds Exist to Disqualify the ALJ.

Finally, Plaintiff argues that the ALJ should have recused herself on remand from the Appeals Council, because the ALJ had access to Plaintiff's August 12, 2015 complaint accusing the ALJ of discriminating against him on account of his young age and disability. (Pl.'s Mem. at 2 (citing to R. 311-18, 322-27, 331-38).) Plaintiff contends that this complaint biased the ALJ against him. (Pl.'s Mem. at 2.) Defendant responds that Plaintiff never asked that the ALJ recuse herself and cannot now meet the heavy burden of proving that the ALJ acted with bias.[12] (Def.'s Mem. at 26-29.)

Under the regulations, an ALJ must recuse herself "if he or she is prejudiced or partial with respect to any party or has any interest in the matter pending for decision." 20 C.F.R. § 404.940. Accordingly, the Court should remand a case if it finds sufficient evidence that the ALJ acted with bias in violation of the plaintiff's due process rights. To that end, the Supreme Court has established a presumption that ALJs act without bias. *Schweiker v. McClure*, 456 U.S. 188, 195-96 (1982) (citing *Withrow v. Larkin*, 421 U.S. 34, 47 (1975); *United States v. Morgan*, 313 U.S. 409, 421 (1941)). A plaintiff bears the heavy burden of rebutting this presumption "by a showing of conflict of interest or some other specific reason for disqualification." *Id.* (citing

---

[12]     Because Plaintiff (represented by counsel at the administrative level) failed to ask that the ALJ recuse herself on remand of his case, the Court finds that Plaintiff may not challenge the ALJ's failure to recuse on judicial review. 20 C.F.R. § 404.940 ("If you object to the [ALJ] who will conduct the hearing, you must notify the [ALJ] at your earliest opportunity.") Accordingly, the Court will analyze only whether Plaintiff presents sufficient proof of bias to establish a violation of his procedural due process rights.

44

*Gibson v. Berryhill*, 411 U.S. 564, 578-79 (1973); *Ward v. Village of Monroeville*, 409 U.S. 57,

60 (1972)); *see also Carter v. Astrue*, 2013 WL 11165172, at *6 (E.D. Va. March 20, 2013)

(characterizing the burden as a "heavy" one (internal citations omitted)).  The plaintiff must

further establish that any bias stemmed from an "extrajudicial source," that is, that the bias

proved personal in nature and was not merely the result of the ALJ's participation in the

decisional process.  *Bowens v. North Carolina Dep't of Human Resources*, 710 F.2d 1015, 1020

(4th Cir. 1983).  Ultimately, "'actual bias or a high probability of bias must be present before due

process concerns are raised.'"  *Carter*, 2013 WL 11165172, at *6 (quoting *Simpson v. Macon

County, N.C.*, 132 F. Supp. 2d 407, 411 (W.D.N.C. 2001)).

   Here, on August 12, 2015, Plaintiff sent an informal letter to the SSA, complaining that

the ALJ discriminated against him because of his young age and disability.  (R. at 312.)  In

support of his complaint, Plaintiff cited to the ALJ's allegedly low approval rating on the SSA's

website.  (R. at 312.)  And Plaintiff vented frustration that the ALJ overlooked the opinions of

Plaintiff's treating physicians and psychiatrists when deciding that Plaintiff did not qualify as

disabled.  (R. at 312.)  The SSA's Office of the General Counsel responded to Plaintiff's letter on

December 10, 2015, stating that it did not have jurisdiction over Plaintiff's complaint, because

Plaintiff failed to allege sufficient facts to support a discrimination claim.  (R. at 323-24.)  In

response, Plaintiff's wife sent a letter to the Appeals Council, reiterating her husband's

complaints of age discrimination and citing to data showing that the ALJ issued more

unfavorable rulings for younger claimants than older ones.  (R. at 331.)

   Plaintiff argues that, because the ALJ could see Plaintiff's complaints against her, the

ALJ had an ethical and moral duty to recuse herself from his case on remand.  (Pl.'s Mem. at 2.)

However, the Court finds that Plaintiff's accusations fail to overcome the strong presumption

that the ALJ acted without bias in denying Plaintiff's DIB claim.  Indeed, a review of the post-remand hearing records reveals no indications of either explicit or implicit bias against Plaintiff. The ALJ did not suggest that she had already reached a conclusion or indicate that she would ignore Plaintiff's genuine complaints of pain.  And the ALJ allowed Plaintiff to testify during both post-remand hearings, asking Plaintiff about the latest developments in his symptoms and giving Plaintiff the opportunity to correct any discrepancies with his prior testimony.  (R. at 80-93, 149-60.)  Moreover, the ALJ's written opinion provides sufficient and rational explanations for the ALJ's findings, demonstrating that the ALJ gave due consideration to Plaintiff's claim. Importantly, substantial evidence in the record — a record untainted by any personal bias — supports the ALJ's conclusions, further undermining Plaintiff's allegations.

Even if the ALJ possessed bias, Plaintiff fails to present evidence that the ALJ's bias proved personal in nature and was not simply the result of the ALJ's participation in the judicial process.  Indeed, Plaintiff's August 12, 2015 complaint makes clear that Plaintiff's basis for arguing age and disability discrimination stemmed largely from the ALJ's unfavorable opinion, not any evidence of personal animosity against the Plaintiff.  (R. at 312.)  And, although Plaintiff's wife later listed data showing that the ALJ more frequently issued unfavorable rulings for younger claimants, such generalized data fails to rescue Plaintiff's accusations of impermissible bias.  (R. at 331.)  Plaintiff must provide proof that the ALJ possessed actual or highly probable personal bias against him and listing general statistics without context falls far short of this burden.

Because Plaintiff failed to present evidence showing a conflict of interest or other specific reason for disqualifying the ALJ, the Court finds no grounds for remand.

## V.    CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 10) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 11) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

Let the clerk forward a copy of this Report and Recommendation to Senior United States District Judge Robert E. Payne, all counsel of record and the *pro se* plaintiff at his address of record.

### NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

/s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date:  January 28, 2019.